# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

EURO PACIFIC CAPITAL INC.,

               Plaintiff,

    vs.

STEVEN SAVOY, and OPPENHEIMER
  & CO. INC.,

               Defendants.

CIVIL ACTION NO.

## <u>VERIFIED COMPLAINT</u>

Plaintiff Euro Pacific Capital Inc. ("Euro Pacific", the "Firm" or "Plaintiff"), by and through its attorney, brings this complaint for temporary and preliminary relief pending arbitration on the merits against Steven Savoy ("Savoy") and Oppenheimer & Co. Inc. ("Oppenheimer") (collectively, "Defendants"), in connection with Savoy's unlawful misappropriation and continued use of Euro Pacific's confidential proprietary information and unlawful solicitation of Euro Pacific clients to transfer their accounts to his new employer, Oppenheimer, in violation of his common-law and contractual obligations to Euro Pacific. Upon information and belief, Oppenheimer is complicit in Savoy's violations of his contractual obligations and misappropriation of Euro Pacific's confidential proprietary information. Taken together, Defendants' conduct constitutes an egregious breach of contract, misappropriation of trade secrets, tortious interference with business relations, unfair competition, slander per se, and civil conspiracy. Euro Pacific allege as follows:

## PARTIES

1.      Plaintiff Euro Pacific is a California Corporation with a principal place of business in Westport, Connecticut.  Euro Pacific provides a variety of financial and investment services, as detailed below.

2.      Defendant Savoy is an individual and resides in New City, New York. Savoy is a former employee of Euro Pacific, and is currently employed by Oppenheimer.

3.      Defendant Oppenheimer is a New York Corporation that provides broker-dealer and investment advisory services, with a principal place of business in New York, New York.

## JURISDICTION

4.      The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as Plaintiff is a citizen of a different state or country compared with each Defendant, and the amount in controversy exceeds the sum or value of $75,000 exclusive of interests and costs.

5.      This Court has personal jurisdiction over Savoy due to the consent to jurisdiction and governing law clauses in the agreements at issue.

6.      The Court has general personal jurisdiction over Oppenheimer because Oppenheimer has engaged in sufficient minimum contacts with Connecticut and has purposefully availed itself of the benefits and protections of the laws of Connecticut, including, but not limited to, operating out of numerous offices throughout the state of Connecticut and engaging in significant business therein.  The Court has specific personal jurisdiction over Oppenheimer because, on information and belief, the acts and

omissions giving rise to Plaintiffs' claims against each occurred, in whole or in part, in Connecticut.

7.      Venue in this District is proper pursuant to 28 U.S.C. § 1391 because, *inter alia*, a substantial part of the events and of the Defendants' wrongful acts and omissions giving rise to Plaintiff's claims occurred in this District, and Defendants are subject to personal jurisdiction in this judicial district.  Moreover, pursuant to the governing agreements, Savoy agreed and consented to the jurisdiction of the courts of Connecticut.

## FACTUAL ALLEGATIONS

### Euro Pacific's Growth and Goodwill

8.      Euro Pacific is a full-service, registered broker/dealer that provides broad financial services across the United States and specializes in foreign markets and securities.  Since its inception, Euro Pacific has built its goodwill and business upon a loyal customer base, client relations, and authentic brand of investment strategy.

9.      Mr. Schiff, Euro Pacific's President, CEO, and sole shareholder, as well as the Firm's Chief Global Strategist and public figurehead, has utilized a unique managerial approach and aggressive marketing strategy to intrinsically and extrinsically grow the Firm since its inception.  He is a public figure in the world of finance, an established media commentator and N.Y. Times bestselling author.  Mr. Schiff has written six (6) books related to investments and economics, hosted a nationally syndicated talk radio show, ran for U.S. Senate in 2010, and was the economic advisor to Ron Paul's 2008 presidential campaign.  He is a keynote speaker at major investment conferences, twice testified before Congress, and is one of the nation's most popular financial video bloggers and podcasters, widely-credited as being one of the

few financial professionals to have accurately forecasted the financial crisis of 2008, and regularly appears on CNCB and Fox Business.

10.    Because of Mr. Schiff's public exposure and the unique nature of his message, like-minded investors seek out Mr. Schiff and, consequently, Euro Pacific to service the investment and financial needs.  Customers and prospects enjoy his writings, listen to his commentary, and share much of his economic philosophy.  Indeed, Mr. Schiff's persona and likeness is intrinsically tied to Euro Pacific and synonymous with its brand.  Thus, a great majority of clients, customers, and prospects found in the Firm's proprietary databases have availed themselves of Euro Pacific's network by way of their interest in Mr. Schiff's works.

11.    Today, Euro Pacific has now grown to include six regional branches – located in Westport, Connecticut; New York, New York; Boca Raton, Florida; Scottsdale, Arizona; Newport Beach, California; and Los Angeles, California – with a team of investment consultants and research analysts and three divisions comprising Retail Brokerage, Wealth Management, and Capital Markets.

12.    Euro Pacific has secured more than 500,000 "leads," developed as a result of an extensive marketing campaign that began in 1994.  Most importantly, these contacts in Euro Pacific's proprietary database share common economic and political concerns, have similar investment objectives, and have consented to communications, due largely to Mr. Schiff's distinctive brand and management approach.

13.    Euro Pacific rarely hires established brokers with books of their own, as its unique niche and extensive marketing efforts enable brokers without books to cultivate a clientele solely utilizing Euro Pacific generated leads and call-ins.  In exchange for the

ease with which Euro Pacific brokers can open accounts and the special relationship those clients have with the Firm, all brokers must agree to keep all customer information confidential.

14.     Euro Pacific's client and prospect lists are especially valuable to the Firm––as such, Euro Pacific takes purposeful measures to vigilantly protect its confidential, proprietary, and trade secret information.  This specific intention is embodied in carefully tailored language within the Firm's employment agreements, including confidentiality and non-disclosure agreements crafted to protect Euro Pacific's proprietary and confidential information, including, but not limited to, the Firm's prospect database comprised of private, personal, and financial information of the Firm's clients and prospects.  All brokers are required to execute these agreements to prohibit them from misappropriating Euro Pacific's proprietary and confidential information.  Absent these assurances, Euro Pacific and Mr. Schiff would not extend employment opportunities to anyone.

**Euro Pacific Employs Savoy**

15.     In or around May, 2008, Euro Pacific hired Savoy as a registered sales representative. In his position, Savoy was responsible for developing the leads generated by Euro Pacific and Mr. Schiff and soliciting business from those past, current, and prospective clients.  In doing so, Savoy was to provide advice as to available securities, financial services, and investment plans based on an evaluation of each client's financial investment risks, needs, and wishes.

16.     As for all other potential employees, Savoy was not required to bring any book of business.  In fact, when he was hired, Savoy did not bring any clients with him to Euro Pacific.  Savoy did not develop a book of business through cold calls or his own

connections in the way brokers at other firms often do.  Rather, Euro Pacific provided
Savoy with pre-existing Euro Pacific clients or qualified leads to service.

17.     To optimize Savoy's position as Euro Pacific's registered sales
representative, Euro Pacific provided Savoy with unlimited access to the Firm's
proprietary prospect database, which includes information concerning the Firm's former
and current clients as well as information concerning leads and potential clients.  Euro
Pacific provided Savoy with access to this database to enable him to service the Firm's
clients and perform his duties and responsibilities.

18.     Through the various Euro Pacific databases, Savoy had unlimited access
to Euro Pacific's extensive client records and information, personal information, and
proprietary information related to the client relationship, including, but not limited to,
names, addresses, telephone numbers, investment profiles, transactional histories,
account types, account balances, asset allocations, income, investment returns, risk
tolerances and liquidity, business strategy information, prospectuses, research, and
other personal financial information ("Proprietary Information").  This information was
compiled with great time, effort, and expenses and constitutes the core of Euro Pacific's
business.  This information was collected and/or created over years of personal service
and allows Euro Pacific to approach clients with an understanding of their goals.  Euro
Pacific paid Savoy and provided him an opportunity to develop, cultivate, and maintain
relationships with its clients.

19.     There is no public source available from which Savoy or anyone else
could ascertain the identities and contact information of Euro Pacific's clients, much less
the high net worth clients he serviced.  The identities of the clients assigned to Savoy at

Euro Pacific are not generally known to third parties, such as competitor financial services firms.  Such client information – including names, addresses, contact information, and account numbers – is highly proprietary and confidential because the information provides a competitor a pronounced advantage in attempting to obtain business from the respective clients at Euro Pacific's expenses.  Efforts to use this information compromises Euro Pacific's business in that a competitor could unfairly use this information to capitalize on historic knowledge of the client, and to destroy goodwill built from years of service.

20.     Pursuant to Euro Pacific's standard hiring procedures, and as a condition of employment at Euro Pacific, the Firm takes specific measures to safeguard it Proprietary Information.  For this reason, all employees who interact with clients are required to sign a confidentiality and non-solicitation agreement.  Savoy is no exception.

21.     At the commencement of Savoy's employment at Euro Pacific, on or about April 4, 2010, Savoy signed a Registered Representative Employment Agreement with Euro Pacific.  On or about August 20, 2013, in connection with Savoy's continued employment at Euro Pacific, Savoy executed a Registered Representative Employment Agreement ("2013 Agreement") with Euro Pacific which contained, *inter alia*, a confidentiality and non-disclosure agreement (the "Confidentiality and Non-Disclosure Agreement").  A true and correct copy of executed 2013 Agreement is attached as **Exhibit A**.  Savoy agreed to execute the agreements in order to assume his responsibilities and gain access to Euro Pacific's Proprietary Information.

22.     By entering into the agreements, Savoy's acknowledged that as a consequence of his employment at Euro Pacific, he would be given access to Euro

Pacific's Proprietary Information, including the identities of Euro Pacific's clients, their names, addresses, telephone numbers, social security numbers, account information, business information, personal information, financial or other information.  In light of his access to confidential information, Savoy agreed not to disclose, reproduce, use, or disseminate such confidential information, except as necessary for the purpose of performing his duties and responsibilities on behalf of Euro Pacific.

23.     More specifically, under the 2013 Agreement, Savoy agreed "to comply, at all times, with all statutory and common law mandates related thereto, and the terms and conditions of the Firm's Confidentiality and Non-Disclosure Agreement."  *See* **Exhibit A**, the 2013 Agreement, at § 8.  Significantly, Savoy's obligations under the 2013 Agreement's Confidentiality and Non-Disclosure Agreement survived termination of Savoy's employment.  *Id.*, at § 18.

24.     Pursuant to the Confidentiality and Non-Disclosure Agreement, "Proprietary Information" is defined non-exclusively as:

(i)     All information that is, or could be considered, a Firm trade secret;

(ii)    All Euro Pacific Client information including, without limitation, identity, contact, demographic, professional, personal, health, financial, investment, transaction history and referral information, as well as all other information that is not readily obtainable by the general public or by competitors, who could obtain economic value from its disclosure or use (collectively, "Euro Pacific Client Information").

1.     Any and all information obtained by researching clients, determining their particular needs, buying habits, etc.;

2.     Any and all information obtained during the marketing of the Firm's financial, investment, consulting and planning services to clients; and

3.      Any and all information derived from the ongoing advising and servicing of clients.

(iii)   The Firm's business methods, including:

(1)   The Firm's methods for marketing its financial products and services including, without limitation, publications, media and other public and promotional activities and events;

(2)   The Firm's financial structure and data related to costs, pricing and profitability of its products and services; and

(3)   The method of selection of investment options, and all software used by the Firm related thereto.

(iv)   All personnel information concerning other staff members including contact, wage and benefits information.

(v)   All vendor information including contact and pricing information.

(vi)   All contracts between the Firm any client, employee or vendor.

(vii)   The Company's policies, procedures and operational information.

(viii)   All copyrighted, proprietary and/or customized software, research materials or related documentation.

(ix)   All work product created or produced by Employee or others, on behalf of the Firm or its clients.

*See* **Exhibit A**, Confidentiality and Non-Disclosure Agreement, at § 2(a).

25.   In connection with Euro Pacific's ownership of the Proprietary Information,

Savoy acknowledged and agreed that:

[D]ue to the unique and substantial marketing efforts and good will associated with building its client and customer base, and the unique nature of Euro Pacific's business model, Euro Pacific and Mr. Peter Schiff, Euro Pacific's Chief

> Executive Officer, retain the exclusive rights to all Euro
> Pacific Client Information at all times, including before during
> and after Employee's employment with the Firm.

*Id*, at § 2(b)(i).

26.     In light of his access to Euro Pacific's Proprietary Information, Savoy

agreed and acknowledged and agreed that Euro Pacific and Mr. Peter Schiff retained

the exclusive rights to the Proprietary Information.  More specifically, Savoy agreed that

he:

> [S]hall not retain or acquire any interest, whether financial,
> proprietary, beneficial, or otherwise, in or to any Euro Pacific
> Client Information, materials, methods and/or other
> Proprietary Information developed hereunder, including but
> not limited to any Proprietary Information developed as a
> result of [his] efforts.

*Id*, at § 2(b)(iii).

27.     Savoy further agreed that:

> In the event that Employee retains and/or acquires any
> rights, in whole or in part, in or to any materials, methods
> and/or Proprietary Information created, developed, exploited,
> modified, and/or generated hereunder, such rights shall be
> deemed immediately assigned to the Firm, in their entirety,
> by virtue of Employee's execution of this Agreement. In the
> event of such an assignment, this Agreement shall operate
> as a document of transfer, and no further writings shall be
> required

*Id*, at § 2(b)(iv).

28.     Upon termination of his employment at Euro Pacific, Savoy agreed that

he:

> [S]hall return to the Firm all Proprietary Information (and all
> copies thereof), and all other materials that contain, in whole
> or in part, any Firm Proprietary Information... [, and] shall
> deliver promptly to the Firm all Proprietary Information, as
> well as any and all information, property, material and
> documentation relating to the Firm, its operation and its

> clients, whether or not of a confidential nature, except
> information to which Employee is otherwise entitled (such as
> Employee's compensation information).  Employee agrees
> that he/she will not retain any Proprietary Information in any
> form or medium without the express written authorization of
> the Firm's Chief Executive Officer or Chief Compliance
> Officer.

*Id.*, at § 2(c)(iii)-(iv).

29.     Savoy agreed that he "shall use his[] best efforts to protect the Proprietary

Information and to prevent its unauthorized disclosure and/or misuse."  *See* Section

2(c)(ii).  Savoy further agreed that he:

> [S]hall not disclose any Proprietary Information to any third
> party, directly or indirectly, by: (a) releasing or transferring
> Proprietary Information without the prior written consent of
> the Firm's Chief Executive Officer or Chief Compliance
> Officer; (b) using Proprietary Information for purposes other
> than the performance of the Services on behalf of the Firm;
> (c) reproducing or transferring Proprietary Information
> without the prior written consent of the Firm's Chief
> Executive Officer or Chief Compliance Officer for any
> purpose other than the performance of the Services on
> behalf of the Firm; or (d) using Proprietary Information in any
> way inconsistent with its proprietary nature or the best
> interests of the Firm.

*Id.*, at § 2(c)(i).

30.     Significantly, regarding the misappropriation of Euro Pacific's Proprietary

Information, Savoy understood and agreed that:

> [T]he unauthorized retention, removal, disclosure and/or use
> of any of the Firm's Proprietary Information, including the
> Firm's trade secrets, is a crime punishable by imprisonment
> for up to one year, a fine up to $5,000.00, or both.  [Savoy]
> further [understood and agreed] that the unauthorized taking
> and/or use of the Firm's Proprietary Information may result in
> civil liability under the California Uniform Trade Secrets Act
> (California Civil Code § 3426, et seq.), as well as other
> applicable laws and regulations, and may result in an award
> of punitive and exemplary damages, as well as the Firm's

> attorney fees and costs incurred as a result of such
> misappropriation.

*Id.*, at § 2(d)(i).

31.     Savoy acknowledged and agreed that:

> [T]he unauthorized retention, removal, disclosure and/or use
> of any Proprietary Information could cause significant and
> irreparable harm to the Firm, the monetary value of which
> may be difficult to ascertain. Accordingly, [Savoy] agree[d]
> that the Firm shall have the right to seek and obtain, upon
> the filing of all required and supporting documentation, an
> immediate injunction enjoining any further breach of this
> Agreement, monetary damages including all profits realized
> by [Savoy] and/or any third party as a result of a breach of
> this Agreement, and any and all other legal remedies
> available under the law.

*Id.*, at § 2(d)(ii).

32.     Regarding the conflicts of interest and non-competition, Savoy

acknowledged and agreed that:

> [F]or the period of employment and this Agreement, [Savoy]
> will not, directly or indirectly, engage in, participate in, or
> have any interest in any business (whether as an owner,
> employee, officer, director, agent, security holder, creditor,
> consultant, representative, or otherwise) that is in
> competition with, and/or is in a conflict of interest in any
> manner whatsoever with the Firm, without the prior written
> consent of the Firm's Chief Executive Officer or Chief
> Compliance Officer, which consent the Firm may grant or
> withhold in its sole discretion.

*Id.*, at § 3(i).

33.     Savoy additionally agreed that:

> During the term of this Agreement and the employment,
> [Savoy] shall not engage in any act that might constitute
> competition with the Firm, and shall not divert any client or
> business away from the Firm, either directly or indirectly.

*See* **Exhibit A**, Investment Consultant Job Description, at § 16(c).

34.     Euro Pacific was repeatedly clear with Savoy about his confidentiality and post-employment obligations, and Savoy repeatedly reaffirmed to Euro Pacific that he would abide by these confidentiality and non-disclosure provisions.  These terms, coupled with Euro Pacific's systemic, technological, and procedural safeguards, evince the Firm's reasonable and sincere efforts to maintain the secrecy of its customer Proprietary Information.

35.     As a condition of employment with Euro Pacific, Savoy, as all registered representatives must do, executed a Form U-4 ("U-4"), which is application to the Financial Industry Regulation Authority ("FINRA") for registration as a general securities representative.

36.     In consideration of the covenants Savoy signed, Euro Pacific agreed to, and did, provide Savoy with confidential information, and it did employ and compensate Savoy, provide him with employment related benefits, and provide him with other good and valuable consideration including assigning him to service specific client account relationships, providing him with Euro Pacific sales support, operational systems, research and investment recommendations, clearing and financial services, Euro Pacific goodwill and reputation, and opportunities to develop relationships with Euro Pacific customers.

**Savoy's Misappropriation of Proprietary Information Prior to Resignation**

37.     Despite the fact that Euro Pacific supplied Savoy with access to the Firm's leads and clients, all of which can be located in the Firm's secure databases, and in breach of his confidentiality and non-disclosure obligations, Savoy intentionally planned and implemented a pervasive and disguised scheme of using Euro Pacific's Proprietary

Information directly against Euro Pacific for the purpose of soliciting Euro Pacific's clients for his and Oppenheimer's own profit and to Euro Pacific's detriment.

38.     Unbeknownst to Euro Pacific, Savoy secretly contracted with Oppenheimer for employment whereby Savoy would act in his similar broker-capacity for Oppenheimer as he did for Euro Pacific.

39.     While under the employment of Oppenheimer (which he kept hidden from Euro Pacific and his co-workers), and prior to resigning from his position at Euro Pacific, Savoy began covertly compiling Proprietary Information from Euro Pacific's databases, including information that would ultimately be used to solicit Euro Pacific clients and leads in violation of the 2013 Agreement and in an effort to induce Euro Pacific clients to transfer their accounts and otherwise divert business from Euro Pacific to Oppenheimer.

40.     For example, on May 6, 2015, approximately three (3) weeks prior to his eventual resignation at Euro Pacific, Savoy created a flash drive that identifies 421 Euro Pacific accounts. For each account on the flash drive, Savoy detailed numerous categories of information including, but not limited to, names, contact information, and account information.  For almost all of the accounts on the flash drive, Savoy detailed mode of delivery by which he would pursue the solicitation of each respective account holder.

41.     In addition to his secretive compilation of Proprietary Information, Savoy's solicitation campaign included misleading statements concerning Euro Pacific and the imposition of fear tactics targeted at its clients.  Incredibly, Euro Pacific clients have reported to Euro Pacific that Savoy has called clients and even emailed them from an Oppenheimer email address – while still employed at Euro Pacific – to discuss his

employment with Oppenheimer and departure from Euro Pacific.  In these calls and emails, Savoy engaged in a smear campaign against Euro Pacific in an effort to convince Euro Pacific clients to transition their accounts to Oppenheimer.

42.     Euro Pacific clients have also represented that Savoy divulged the Firm's non-public internal business and financial information and other Proprietary Information.

43.     These statements were made to improperly suggest that Euro Pacific was not acting in its clients' best interest and to damage client relationships before Euro Pacific had an opportunity to defend itself against such baseless accusations.  Through Savoy's efforts to persuade Euro Pacific clients to transfer their accounts from Euro Pacific to Oppenheimer, Defendants have willfully and knowingly engaged in deceptive and false marketing and advertising efforts.

44.     Upon information and belief, also while still under the employ of Euro Pacific, Savoy advised and induced certain clients to leave portions of their investment accounts in cash or other liquid positions to make the transfer of the funds from Euro Pacific to Oppenheimer easier to effectuate.

**Savoy's Masked Resignation and Further Misappropriation of Proprietary Information**

45.     Not only did Savoy secretly steal proprietary information, make affirmative misrepresentations about Euro Pacific, and convince the Firm's clients to transfer their accounts from Euro Pacific to Oppenheimer, Savoy also masked his departure and resignation from Euro Pacific to further his improper solicitation scheme by delaying the implementation of the Firm's protocols and termination procedures.

46.     Euro Pacific employees recall Savoy quietly and swiftly leaving on Thursday May 21, 2015, offering no indication that this was his final day in the office after seven years with Euro Pacific.

47.     It was not until May 22, 2015, the Friday afternoon before the three-day Memorial Day holiday weekend, when Savoy sent his deficient notice of resignation to the improper recipient, Mr. Schiff.  A true and correct copy of Savoy's May 22, 2015 email is attached as **Exhibit B**.  Pursuant to Section 16 of the 2013 Agreement, Savoy was required to contact Eric Steingruebner ("Mr. Steingruebner"), his direct supervisor. Instead, Savoy sent a nondescript email to Mr. Schiff, who Savoy knew was out of the office at the time, from his personal email account (and not his work email account) attaching his letter of resignation.  The subject line merely stated: "Steven Savoy," and the body of the email merely stated: "Please see the attached document."

48.     Significantly, the 2013 Agreement also required that Savoy send his resignation with a return receipt to confirm that the email was received by its intended recipient.  This is critical because the requirement ensures Euro Pacific knew if a broker resigned.  By sending his May 22, 2015 email to the improper recipient and failing to request a return receipt, Savoy deliberately tried to conceal his resignation to deny Euro Pacific's rights under the agreement.

49.     Savoy's improper resignation prevented Euro Pacific from promptly carrying out its termination procedures towards protecting its sensitive client information, pursuant to internal protocols and Regulation SP considerations.  The timeliness of such safeguard measures is critical to securing Euro Pacific's Proprietary Information and other trade secrets.

50.     During the time in which Euro Pacific remained unaware of Savoy's deficient resignation, Savoy unduly retained unfettered access to Euro Pacific's sales team privileges, such as his broker-dealer workstation with voluminous customer information, the company portal, and other proprietary databases containing client information and other confidential records.

51.     Since the Firm reasonably believed Savoy remained an employee, Euro Pacific continued providing Savoy with an abundant supply of prospects, due to his high-ranking status within Euro Pacific, such as regular emails with fresh leads from the Firm's Customer Relationship Management (CRM) system just days after his May 22, 2015 email resignation.

52.     As a consequence of Savoy's masked resignation, Euro Pacific was also deprived of the opportunity to debrief Savoy with an informal exit interview, where he would have been reminded of continuing obligations and requested that he return all confidential and proprietary records.  Euro Pacific could not best exercise its termination policies or administrative safeguards-procedures, such as removing privileges and access to electronic and physical resources.

53.     The timing and manner of Savoy's deficient notice was far from arbitrary, and his departure had adverse implications to Euro Pacific's business and security of its Proprietary Information, jeopardizing trade secrets and causing significant liability issues.

54.     Not only had Savoy remitted a deficient letter of resignation, in a further effort to mask his departure from Euro Pacific, Savoy set-up an "automated response"

for his employee email account that misleadingly read: "I am currently out of the office with no access to email or voice mail…."

55.     As a direct result of his failure to adequately notify the Firm of his resignation, Savoy was able aggressively solicited Euro Pacific clients on a mass scale during Memorial Day weekend before Euro Pacific could accept or address his departure and while Savoy still had access to the Firm's proprietary databases. Such solicitation is in direct violation of the 2013 Agreement, as Savoy misappropriated Proprietary Information including, but not limited to, protected client lists and confidential and trade secret information, including voluminous consumer financial information protected under Regulation SP.

56.     During this period, Savoy made phones calls, left voicemails, sent emails, and mailed Federal Express ("FedEx") packages containing account transfer forms to Euro Pacific clients. Savoy's solicitation of Euro Pacific clients was repeated and persistent, as some clients reported to have received as many as five (5) unreturned voicemails over the four-day period. Upon information and belief, by the end of the Memorial Day weekend, over a hundred customers had received such communications and/or account transfer materials that were prepared in well in advance of Savoy's resignation.

57.     Furthermore, in light of Savoy's change in employment from Euro Pacific to Oppenheimer, Savoy was required to file a Form U4 with FINRA in order to become a registered investment adviser representative at Oppenheimer, pursuant to FINRA rules. Savoy's filed U4, however, was not approved until May 26, 2015, four (4) days after

Savoy began his mass solicitation campaign on behalf of Oppenheimer. A true and correct copy of Savoy's FINRA BrokerCheck Report is attached as **Exhibit C**.

58.     Savoy's acts violate FINRA's prohibition against soliciting accounts prior to his U-4 becoming effective. FINRA's webpage provides answers to frequently asked questions ("FAQs") about FINRA registration and qualification requirements. A true and correct copy of the FAQs is attached as **Exhibit D**. FAQ Number 5 under the title "Registration" asks "Can I solicit customer accounts once my firm submits the Form U-4 and fees for me to FINRA, but **before** my registration becomes effective?" *See* **Exhibit D**, at p. 4 (emphasis added.). FINRA responds, in a clear and unambiguous fashion:

> *No*. *You may not* perform registered representative functions *until your registration becomes effective* with all regulatory organizations and state securities commissions. You may work in other areas at the securities firm if the tasks do not require registration.

*Id.* (emphasis added).

59.     Based on FINRA's own published guidelines, brokers that leave one firm and join another cannot solicit clients until the date the new registration becomes effective, even if the new firm submits a new U¬4 and pays all necessary fees. Savoy's FINRA BrokerCheck indicates that his Oppenheimer registration with FINRA, various exchanges, and individual states was not effective until May 26, 2015. *See* **Exhibit C**. Therefore, from May 22 through May 25, when Savoy was soliciting customer accounts of the Firm, he was either licensed at Euro Pacific (in which case he breached intrinsic duties of loyalty and explicit provisions within his employment agreements) or he was illegally soliciting brokerage accounts without being appropriately registered with FINRA or any of the states. Indeed, all solicitations prior to the May 26 – i.e., those undertaken

through Memorial Day weekend on behalf of Oppenheimer – violate FINRA rules since they occurred prior to Mr. Savoy's registration becoming effective.

60.     Also troublesome is that Oppenheimer and Savoy had certified and filed his Form U4, registering him while his license was still held with Euro Pacific, at a time when Savoy knew or should have known that Euro Pacific still believed he was their employee.

61.     Indeed, Euro Pacific only learned of Savoy's resignation on May 26, 2015, the Tuesday following Memorial Day weekend.  That day, four (4) days after he sent his original email to Mr. Schiff, Savoy "forwarded" his resignation letter to his supervisor Mr. Steingruebner.  A true and correct copy of Savoy's May 26, 2015 email is attached as **Exhibit E**.  Consequently, Savoy had unfettered access to Euro Pacific for that entire period of time, free from implementation of Euro Pacific termination protocols and procedures.

62.     Immediately upon learning of Savoy's resignation and improper solicitation tactics, on May 26, 2015, Euro Pacific called Savoy immediately to discuss Savoy's departure and to remind Savoy of his continuing obligations pursuant to the 2013 Agreement.

63.     Shortly after discovering Savoy's egregious conduct, Euro Pacific's attorneys and Mr. Schiff sent multiple emails and letters to Savoy formally demanding that Savoy immediately cease his violative conduct.  True and correct copies of emails from Euro Pacific's attorneys and Mr. Schiff to Savoy are attached as **Exhibit F.**

64.     Despite Savoy's contractual and legal obligations to refrain from soliciting Euro Pacific clients and using the Firm's Proprietary Information and despite the formal

demands that Savoy refrain from such conduct, Savoy continues to this day to solicit Euro Pacific clients, use the Firm's Proprietary Information, and employ deceptive tactics, as described above.

65. Notably, Savoy continues solicit Euro Pacific clients through the same communication mediums as he did during Memorial Day weekend, which evinces that Defendants still remain in possession of Euro Pacific's Proprietary Information, including, but not limited to, names, addresses, emails, and account information.

66. Not only do Defendants remain in possession of the Proprietary Information in the format that Savoy originally brought to Oppenheimer (i.e. flash drives and printed spreadsheets) they are now in possession of this information in a variety of other forms by way of Savoy's improper solicitation as an employee of Oppenheimer. For example, Savoy's emails from his Oppenheimer email address to Euro Pacific clients have resulted in those clients' email addresses being saved on Oppenheimer's email systems and archives.  Savoy's calls from his Oppenheimer telephone have resulted in those clients' telephone numbers being saved on Oppenheimer's telephone systems and archives.  Savoy's FedEx packages to Euro Pacific clients have left Defendants with FedEx receipts that include those clients' mailing address.

67. In violation of FINRA privacy rules, Savoy also illegally took with him personal information associated with various accounts, including, but not limited to, account values and account holders' dates of birth.

68. Savoy's solicitation tactics also remain persistent, as Savoy repeatedly bombards Euro Pacific clients through the various mediums, despite the clients' explicit instructions to cease such solicitation.  For example, Savoy still sends emails to

prospective clients regarding his transition to Oppenheimer, followed by telephone calls to responsive and even non-responsive targets.  During those solicitations, Savoy continues to criticize Euro Pacific's strategy and the performance of their accounts, while explaining the services provided by Oppenheimer.  Even after unsuccessful solicitation efforts, Savoy proceeds to send emails and FedEx packages containing account transfer forms.  Even after receiving explicit notice from Euro Pacific clients that they have no intention of transferring their investments to Oppenheimer and explicit requests that he and Oppenheimer to stop soliciting, Savoy will still respond by attempting persuade Euro Pacific's clients to reconsider their decision.

69.     Moreover, the sheer volume of transfer forms that Savoy transmitted to Euro Pacific clients evinces that (1) the transfer forms were not requested – indeed, many Euro Pacific clients report having received FedEx packages despite not having returned any of Savoy's numerous voicemail messages subsequent to his departure from Euro Pacific; (2) Savoy had no indication of which Euro Pacific clients were interested in transferring their accounts to Oppenheimer, so he decided to engage in the mass solicitation equivalent of a fishing expedition; and (3) Savoy has retained in his possession a vast and comprehensive list of Euro Pacific client's contact information.  In fact, Savoy's ability to reach out to so many Euro Pacific customers via telephone, email, and FedEx in such a short time period further evinces Savoy's intentional misappropriation of Euro Pacific's client contact information.

70.     As a consequence of Savoy's misconduct, numerous Euro Pacific clients served by Savoy have already closed their accounts and transferred their funds to Oppenheimer, leading to significant depletion in assets under Euro Pacific's

management and losses in Euro Pacific's recent net income.  Euro Pacific will be deprived of short-term and long-term revenue streams that these clients would have produced through their continued investment in the Firm.  As a result, Oppenheimer has and will continue to be unjustly enriched by the financial benefits arising from Savoy's improper usage this Proprietary Information.

71.     More troubling, the language accompanying the various written requests by Euro Pacific clients to close their accounts appears to be identical, which indicates that these clients are being coached with uniform directives and suggests the collusion between Savoy and Oppenheimer with respect to improper use of Euro Pacific's Proprietary Information to solicited clients.

72.     Savoy not only poach Euro Pacific's existing client base, but he also stole leads and prospective clients.  Similar to the damaging financial consequences arising from Euro Pacific clients transferring their investments to Oppenheimer, Euro Pacific has and/or will be deprived of the financial benefit associated with successfully converting those leads and prospects into actual clients.  As a result, Oppenheimer has and/or will continue to be unjustly enriched by the financial benefits arising from Savoy's improper usage of this Proprietary Information.

73.     As Savoy continued to solicit Euro Pacific clients despite receiving orders from Euro Pacific to cease such conduct, Euro Pacific sent a formal cease and desist letter to Oppenheimer on May 28, 2015.  A true and correct copy of Euro Pacific's May 28, 2015 letter is attached as **Exhibit G**.  In response, on June 1, 2015, Oppenheimer sent Euro Pacific letter stating that they had instructed Savoy not to solicit any clients

whom he learned through his association.  A true and correct copy of Oppenheimer's June 1, 2015 letter is attached as **Exhibit H.**

74.     However, despite these proclaimed instructions by Oppenheimer, Savoy continued his solicitation campaign by aggressively contacting Euro Pacific clients, leading to further harm to the Firm.  Thus, on June 8, 2015, Euro Pacific sent Oppenheimer another demand letter identifying facts and circumstances establishing that Savoy's solicitation has continued, causing significant harm to Euro Pacific in violation of Savoy's common-law and contractual duties.  A true and correct copy of Euro Pacific's June 8, 2015 letter is attached as **Exhibit I**.

75.     On June 15, 2015, Oppenheimer sent to Euro Pacific a FedEx package that included a flash drive and cover letter.  A true and correct copy of Oppenheimer's June 15, 2015 letter is attached as **Exhibit J**.  The cover letter proclaimed that the flash drive contained a spreadsheet listing the names and contact information of Savoy's clients at Euro Pacific, and that the information was not copied to another electronic device.  The cover letter, however, failed to affirm that the flash drive was the only device in Savoy's or Oppenheimer's possession that contains Euro Pacific client information; the letter only indicates that the flash drive itself has not been copied.

76.     Indeed, a brief review of the contents of the spreadsheet on the flash drive indicates otherwise.  For example, the spreadsheet does not include telephone numbers or email addresses of Euro Pacific client, yet, as detailed above, Savoy made telephone calls and sent emails to hundreds of Euro Pacific clients.  Savoy and Oppenheimer cannot reasonably argue in good faith that Savoy maintained this

information in his memory and without the assistance of notes and summaries independent from the flash drive.

77.     In addition, the metadata on the flash drive indicate that the spreadsheet was created on May, 6, 2015, but was subsequently tampered with.  Thus, upon information and belief, the spreadsheet was copied into another device either in part or in its entirety.

78.     As Savoy is well aware through his seven-year tenure at Euro Pacific and execution of the 2013 Agreement, Europe Pacific takes numerous steps to preserve the confidentiality of its client information.  In addition to requiring employees to sign agreements such as those described above, the steps include implementing additional protocols and procedures to preserve and safeguard confidential customer information.

79.     The books, files, and records of Euro Pacific, and especially the data pertaining to Euro Pacific's clients, constitutes confidential and trade secret information. This information derives independent economic value because it is not generally known to competitors who can profit from its use or disclosure.  Euro Pacific has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which is of great value to any competitor.

80.     Euro Pacific has taken more than adequate measures under the circumstances to maintain the secrecy of this information, including assigning computer access passwords to be used to access Euro Pacific computer systems and records, restricting access to its business premises, implementing policies such as those described above, and having employees, including Savoy, sign agreements which expressly prohibit the use and disclosure of such information out of Euro Pacific.

81.     By compiling Euro Pacific's Proprietary Information and discussing his anticipated and actual departure from Euro Pacific with the Firm's clients (who Savoy knew have a need for financial services), Savoy breached his duty of loyalty to Euro Pacific.  Further, by using existing and prospective client information that he learned solely through Euro Pacific, Savoy has – at a minimum – violated his contractual and common-law obligations not to use your Euro Pacific's Proprietary Information.  Such misappropriation and self-dealing directly conflicts with the fiduciary obligations associated with his role Euro Pacific's agent in contemplated business transactions with these existing and prospective clients.

82.     Savoy's false statements and misrepresentations to Euro Pacific's clients has and/or will continue to proximately cause those clients to close their accounts and transfer their investments into third-party financial services entities, leading to the same negative short-term and long-term financial implications discussed above.  Further, Savoy's false statements and misrepresentations has and will continue to proximately cause Euro Pacific's brand and goodwill to be tarnished, leading to wide-spread irreparable damage to Euro Pacific.

83.     Savoy's conduct was not privileged, and has resulted in great and ongoing damage to Euro Pacific.  Euro Pacific is informed and believes that unless enjoined from doing so, Savoy and Oppenheimer will otherwise continue to engage in wrongful and unlawful acts.

84.     Because Savoy is a person currently and/or formerly associated with FINRA member firm, the parties have agreed and are obligated to arbitrate the merits of the claims before FINRA Dispute Resolution pursuant to the FINRA Code of Arbitration

Procedure.  FINRA Code of Arbitration Rule 13804 provides that any party seeking preliminary injunctive relief must do so exclusively in a court of competent jurisdiction.

## COUNT I
### (Misappropriation of Trade Secrets)

85.    Euro Pacific repeats and incorporates by reference the allegations contained in paragraphs 1 through 84 as if fully set forth herein.

86.    Euro Pacific's confidential Proprietary Information is proprietary trade secret information that is a business asset of Euro Pacific and that derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by persons who can obtain economic value from its disclosures.

87.    Euro Pacific used reasonable efforts to maintain the secrecy of its confidential client information.

88.    Savoy and Oppenheimer knowingly, willfully, and maliciously misappropriated Euro Pacific's confidential client information by improper means, and Defendants have subsequently and wrongfully used it for Defendants' own benefit, damaging Euro Pacific.

## COUNT II
### (Violation of the Uniform Trade Secrets Act)

89.    Euro Pacific repeats and incorporates by reference the allegations contained in paragraphs 1 through 88 as if fully set forth herein.

90.    Defendants knowingly, willfully, and maliciously misappropriated Euro Pacific's Proprietary Information, damaging Euro Pacific and in violation of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Laws, Conn. Gen. Stat. § 35-50 *et seq.*

## COUNT III
## (Tortious Interference with Contract)

91.     Euro Pacific repeats and incorporates by reference the allegations contained in paragraphs 1 through 90 as if fully set forth herein.

92.     Euro Pacific maintained business relationships and entered into contractual agreements with its clients for a variety of financial services while Savoy was engaged as Euro Pacific's agent as the broker to many of these business transactions.

93.     Defendants repeatedly have and continue to intentionally and improperly interfere with Euro Pacific's advantageous relationships with these clients by, *inter alia*, using Euro Pacific's confidential trade secrets, including, but not limited to, the confidential client contact information, to contact Euro Pacific's clients and attempt to persuade them to break their agreements with Euro Pacific, close their accounts at Euro Pacific, and to transfer their investments into Oppenheimer.

94.     As a result of this intentional interference, key Euro Pacific clients and accountholders who invested there monies in Euro Pacific and utilized Euro Pacific's financial and investment services have closed their accounts at Euro Pacific and transferred their investment to Oppenheimer.

95.     Defendants' actions have interfered with and are continuing to interfere with Euro Pacific's client relationships and probable future business relationships from which Euro Pacific reasonably expected financial benefit in the short-term and long-term.

96.     Euro Pacific has been damaged and continues to suffer damages by Defendants' wrongful and tortious interference with Euro Pacific's advantageous business relationships.

## COUNT IV
## (Replevin)

97.     Euro Pacific repeats and incorporates by reference the allegations contained in paragraphs 1 through 96 as if fully set forth herein.

98.     Euro Pacific's Proprietary Information and trade secrets in Defendants' possession have substantial value to Euro Pacific.  Euro Pacific is the rightful owner of its Proprietary Information and trade secrets.

99.     Defendants are unlawfully in possession of Euro Pacific's Proprietary Information and trade secrets.

100.    As a result of Defendants' unlawful possession of Euro Pacific's Proprietary Information and trade secrets, Euro Pacific has suffered, and continues to suffer, damages.

## COUNT V
## (Breach of Fiduciary Duty – Savoy)

101.    Euro Pacific repeats and incorporates by reference the allegations contained in paragraphs 1 through 100 as if fully set forth herein.

102.    Savoy, as Euro Pacific's agent, was a fiduciary of Euro Pacific and owed Euro Pacific a fiduciary duty of utmost loyalty and good faith.  The relationship between Euro Pacific and Savoy was one of trust and confidence such that Savoy was duty-bound to act with scrupulous fairness and good faith in his dealings with Savoy and to refrain from engaging in conduct to Euro Pacific's detriment or disadvantage.

103.   Savoy breached his fiduciary duties to Euro Pacific by, *inter alia*, taking advantage of the very entity he served and was legally sworn to protect.  Instead of acting in Euro Pacific's best interests, Savoy entered into a series of conduct as described above that was guided by his own self-interest and profit.  No person of ordinary, sound business judgment could conclude the transactions represented a fair exchange.

104.   Savoy's egregious conduct constitutes a breach of his fiduciary duties to Euro Pacific.

105.   As a result of Savoy's breach of fiduciary duty, Euro Pacific has suffered, and continues to suffer, damages.

## COUNT VII
## (Unfair Competition)

106.   Euro Pacific repeats and incorporates by reference the allegations contained in paragraphs 1 through 105 as if fully set forth herein.

107.   Upon information and belief, Savoy and Oppenheimer devised and implemented a disguised scheme designed to misappropriate Euro Pacific's confidential Proprietary Information and trade secrets in order to solicit and poach Euro Pacific's former, existing, and prospective clients.

108.   Savoy's conduct constitutes unfair methods of competition in trade or commerce and has damaged, and will continue to damage, Euro Pacific.

## COUNT VIII
## (Civil Conspiracy)

109.   Euro Pacific repeats and incorporates by reference the allegations contained in paragraphs 1 through 108 as if fully set forth herein.

110.    Savoy and Oppenheimer entered into an agreement designed to improperly and illegally solicit and poach Euro Pacific's former, existing, and prospective clients, which they carried out by Defendants' misappropriation of Euro Pacific's Proprietary Information and trade secrets and use of that information in order to persuade Euro Pacific clients to transfer their investments to Oppenheimer.

111.    As a result of Defendants' concerted tortious conduct, Euro Pacific has suffered, and continues to suffer, damages.

## COUNT IX
### (Breach of Contract – Savoy)

112.    Euro Pacific repeats and incorporates by reference the allegations contained in paragraphs 1 through 111 as if fully set forth herein.

113.    Savoy entered into the 2013 Agreement with Euro Pacific, whereby Savoy, *inter alia*, acknowledges and agreed that in the course and scope of his employment with Euro Pacific, he would "gain access to, develop, and/or participate in the compilation and/or development of confidential, proprietary and/or trade secret information."  *See* 2013 Agreement, at Section 8.  Accordingly, Savoy agreed "to comply, at all times, with all statutory and common law mandates related thereto, and the terms and conditions of the Firm's Confidentiality and Non-Disclosure Agreement."

114.    Savoy also agreed not to misappropriate or disclose any of Euro Pacific's confidential Proprietary Information.

115.    Savoy breached the 2013 Agreement by, *inter alia*, compiling and misappropriating Euro Pacific's Proprietary Information and trade secrets in an unlawful attempt to persuade Euro Pacific's clients to transfer the accounts to Oppenheimer.

116.   As a result of Savoy's breach, Euro Pacific has suffered, and continues to suffer, damages.

## COUNT X
### (Unjust Enrichment)

117.   Euro Pacific repeats and incorporates by reference the allegations contained in paragraphs 1 through 116 as if fully set forth herein.

118.   Defendants wrongfully obtained profits and received benefits as a result of their wrongful conduct and misappropriation of Euro Pacific's Proprietary Information and trade secrets.  Defendants were aware of the benefits conferred on them and knowingly accepted those benefits.

119.   As a result, Defendants have been unjustly enriched at Euro Pacific's expense, and it would be inequitable under the circumstances to allow Defendants to retain the profits and benefits conferred on them.

## COUNT XI
### (Slander Per Se -- Savoy)

120.   Euro Pacific repeats and incorporates by reference the allegations contained in paragraphs 1 through 119 as if fully set forth herein.

121.   Savoy made verbal statements and misrepresentations to Euro Pacific's clients concerning Euro Pacific as specified above were false and defamatory statements of fact.

122.   Savoy knew that the verbal statements he made concerning Euro Pacific were false.

123.   The verbal statements made by Savoy as specified above, which impute occupational incompetence or misconduct by Euro Pacific, impute characteristics which are incompatible with Euro Pacific's business, trade or occupation, prejudice Euro

Pacific in the conduct of its trade or business, and have deterred others from dealing with Euro Pacific.

124.    The verbal statements made by Savoy constitute slander per se.

125.    As a result of Savoy's conduct, Euro Pacific has suffered, and continues to suffer, damages.

## COUNT XII
### (Injunctive Relief)

126.    Euro Pacific repeats and incorporates by reference the allegations contained in paragraphs 1 through 125 as if fully set forth herein.

127.    Euro Pacific is likely to succeed on the merits as (a) Euro Pacific is the rightful owner of its Proprietary Information and trade secrets, (b) Defendants knowingly misappropriated Euro Pacific's confidential client information and are unlawfully in possession of Euro Pacific's confidential client information, (c) Defendants intentionally interfered with Euro Pacific's business relationships with former, existing, and prospective clients by improper use of Euro Pacific's confidential client information, and (d) Defendants intentionally used Euro Pacific's confidential client information to lure those clients from Euro Pacific to Oppenheimer.

128.    Euro Pacific will suffer irreparable harm if Defendants continue to use Euro Pacific's Proprietary Information and trade secrets to solicit and poach Euro Pacific's clients.

129.    Time is of the essence, as Defendants' illegal actions are frustrating ongoing and prospective contractual relationships between Euro Pacific and its clients.

130.   The status quo ante will be preserved by enjoining Defendants from using Euro Pacific's Proprietary Information and trade secrets to solicit and poach Euro Pacific's former, existing, and prospective clients.

131.   A balance of the equities favors entering a temporary restraining order and granting injunctive relief against Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands temporary and preliminary injunctive relief pending the outcome of an expedited arbitration hearing to be held pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure, and respectfully requests that this Court:

1.   Temporarily restrain and thereafter enjoin Defendants to return all of Euro Pacific's Proprietary Information, whether in original, copied, computerized, handwritten, or in any other form, including but not limited to all confidential client and financial information – including all copies thereof – to Euro Pacific;

2.   Temporarily restrain and thereafter enjoin Defendants from retaining, using, or disclosing any of Euro Pacific's Proprietary Information and from contacting Euro Pacific's clients and prospective clients or any other clients whose identities Savoy learned as a result of his employment at Euro Pacific, including but not limited to for the purpose of inviting, encouraging, or requesting the transfer of any clients business from Euro Pacific to Oppenheimer;

3.   Temporarily restrain and thereafter enjoin Defendants from further misappropriation of any of Euro Pacific's trade secrets and confidential proprietary information;

4.      Temporarily restrain and thereafter enjoin Defendants from destroying, erasing, or otherwise making unavailable for further proceedings in this matter, any records or documents (including data or information maintained in computer files or other electronic storage media) in Defendants' possession or control which were obtained form, or contain information derived from, any Euro Pacific records, which pertain to Euro Pacific clients, or which relate to any of the events alleged in this Complaint;

5.      Temporarily restrain and thereafter enjoin Defendants from continued interference with Euro Pacific's client relationships and probable future business relationships from which Euro Pacific reasonably expected financial benefit;

6.      Order Defendants to produce to Euro Pacific all communications, including call logs, emails, and correspondence, between Defendants and Euro Pacific clients and client prospects;

7.      Order Defendants sit for a deposition concerning the matters alleged in this Complaint; and

8.      Award Euro Pacific such other additional or alternative equitable and/or legal relief as the Court deems appropriate.


Dated:  New York, New York
        June 19, 2015

                                            ANDERSON KILL P.C.

                                            By:   /s/ Christopher L. Ayers, Esq.
                                                  Christopher L. Ayers, Esq.
                                                  cayers@andersonkill.com
                                                  1251 Avenue of the Americas
                                                  New York, NY 10020
                                                  (212) 278-1000
                                                  Attorney for Plaintiff

## **VERIFICATION OF COMPLAINT**

STATE OF CONNECTICUT           )
                               ) SS
COUNTY OF FAIRFIELD            )

Peter Schiff, hereby affirms under penalty of perjury as follows:

1.      I am authorized by Euro Pacific Capital Inc. to execute, and am executing, this

verification on behalf of the Euro Pacific Capital Inc.

2.      I have read the foregoing Verified Complaint, and the facts recited therein are true

and correct to the best of my knowledge, information, and belief.

_____
Peter Schiff

AFFIRMED TO AND SUBSCRIBED before
me this _17th_ day of June 2015

_____
Notary Public

| Marion Lanice Miller |
| *Notary Public* |
| *My Commission Expires Sept. 30, 2017* |